# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
June 15, 2017

     Plaintiff-Appellee,

v

No. 332258
Calhoun Circuit Court
LC No. 2015-001604-FH

RAY W COLE,

     Defendant-Appellant.

Before: O'BRIEN, P.J., and HOEKSTRA and BOONSTRA, JJ.

PER CURIAM.

Defendant appeals by right his conviction, following a jury trial, of third-degree criminal sexual conduct (CSC III), MCL 750.520d(1)(b) (penetration with force or coercion). The trial court sentenced defendant to serve a term of imprisonment of 60 to 180 months, with 70 days' credit for time served. We affirm.

## I. PERTINENT FACTS AND PROCEDURAL HISTORY

The prosecution charged defendant with CSC III, naming KS as the victim. Before trial, the prosecution filed a notice of intent to present, as other acts evidence under MRE 404(b), witness testimony from RW concerning a second uncharged sexual assault that defendant allegedly perpetrated on the same afternoon as the charged assault. The prosecution argued that RW's testimony would show that defendant had acted in accordance with a common scheme or plan, in that he knew both women, lured them to his place of employment outside of business hours, locked them inside, and assaulted them. Defendant objected that the prosecution sought to introduce impermissible character evidence, arguing that the two encounters, which defendant insisted were consensual, were not sufficiently similar to show a common scheme or plan.

The trial court permitted RW's testimony as other-acts evidence under MRE 404(b). The trial court noted the prejudicial effect of the evidence, but found RW's testimony to be probative of "the way that [defendant] chose his victims, the way he asked his . . . alleged victims . . . to come to his place of employment, and the manner in which he perpetrate[d] the alleged assaults." The court held that the evidence related to material issues of fact regarding consent, timing, location, "how the victim was contacted," and "where the victim was when the alleged assault took place."

-1-

At trial, KS testified that she met defendant about two weeks before the incident at issue, and that she occasionally patronized a bar where defendant worked as a bartender. KS stated that she and a companion visited the bar on the evening of February 7, 2015, and then returned the following morning, a Sunday (apparently to retrieve KS's car). They found defendant at work but the premises otherwise unoccupied. According to KS, defendant initially declined offers for a ride home, but not long after KS and her companion left, defendant sent KS a message asking for a ride. KS returned to the bar alone in her own car, expecting to leave shortly thereafter. Defendant met KS at the door and locked it after she was inside. Defendant began asking KS questions about her personal and sex life. Defendant excused himself to use the restroom; when he returned, KS was "standing in front of the pool table" and moving closer to the door. KS testified that defendant resumed talking suggestively, put his hands under her sweatshirt, touched her breasts, and tried to kiss her despite her protests. Defendant then pressed her "against the pool table," in response to which she "sat on the pool table" to try to move away from defendant, but defendant followed her onto the table and held her by the arm. Defendant "started to pull [her] pants down" and touch her under her pants, and also pulled his own pants down a bit. KS asked defendant to "stop and to get off" her, but defendant told her "that it was fine because he had a condom on." KS testified that defendant's "penis was inside of [her] vagina" for a time, but that defendant eventually stopped due to her screaming or tone of voice. KS admitted that after the incident she drove defendant home.

Testifying in his own defense, defendant substantially agreed with KS's account of when and how he and KS arrived at and departed from the bar, but differed from KS in stating that he thought she had signaled some attraction to him, and that he had attempted to initiate sex by approaching KS with his penis in his hand, but immediately backed off when KS expressed discomfort. Defendant indicated that he may have accidentally penetrated KS or penetrated her prior to her expressing that she didn't want to have sex. Defendant also testified that, at the same time he sent a message asking KS for a ride, he sent a similar message to RW.

Before RW offered her account of the second incident with defendant, the trial court instructed the jury as follows:

> You may or will hear evidence that is introduced to show that the Defendant committed a crime for which he is not on trial. If you believe this evidence, you must be very careful only to consider it for certain purposes.

> You may only think about whether or not this evidence tends to show that Defendant used a plan, scheme, or characteristic scheme that he has used before or since.

> You must not consider this evidence for any other purpose. For example, you must not decide that it shows that the Defendant is a bad person or that he is likely to commit crimes.

> You must not convict the Defendant here because you think he is guilty of other bad conduct.

> All of the evidence must convince you beyond a reasonable doubt that the Defendant committed the alleged crime or you must find him not guilty.

RW testified that she lived near the bar where defendant worked, and had known defendant for ten years. She admitted that she had been interested in dating defendant a few years earlier, and stated that the two had exchanged electronic messages in the weeks before February 8, 2015, that defendant invited her out to eat, and that she told him she had a boyfriend. RW confirmed that defendant sent her a message on the afternoon of February 8, 2015, asking her for a ride, and stated that she did not have a car but walked to the bar to meet defendant, expecting to have a drink and socialize. RW testified that defendant let her in and locked the door behind her, then pushed her onto the pool table. According to RW, defendant's "pants were down . . . around his ankles," and he pulled her pants down. RW stated that she ended up lying on the pool table, while defendant "was having sex with" her, by which she meant that defendant's penis was inside her vagina. RW added that she felt confused and protested, but that defendant put his hand over her mouth so that she could not talk.

On cross-examination, RW agreed that she was acquainted with her ex-husband's brother, Greg Gwillim. Gwillim testified that he was defendant's best friend, and that RW had a reputation for being untruthful. When defense counsel asked RW if she had ever lost a baby, RW responded that she had, upon which the prosecuting attorney objected. While the attorneys and the court were discussing the propriety of that line of questioning, RW interjected that she had records of her pregnancy.

The trial court stated that defendant was "entitled to explore" RW's credibility, but expressed concern over defense counsel's intention to ask RW about her history of mental illness or of fabricating stories. Defense counsel referred to RW as a "crazy person," and stated his intention to bring witnesses to testify about RW's history of untruthfulness. The trial court determined that defense counsel had not demonstrated that any of RW's alleged mental health issues had a bearing on her credibility, and excluded evidence concerning RW's mental health history.

The court took a half-hour recess to allow defense counsel to locate authority favoring the introduction of extrinsic evidence to show that RW had a history of lying. After the recess, the court asked defense counsel if had something to put on record, and counsel replied that he thought it unnecessary and was prepared to "go on otherwise." The trial court struck from the record "anything involving [RW's] history of being or not being pregnant" and admonished the jury not to consider RW's testimony on that subject "as evidence in this case."

At the close of proofs, the trial court repeated the instruction concerning other-acts evidence that the court had provided before RW testified. The court further instructed the jury to consider the evidence relating to RW's character for truthfulness "together with all of the other evidence in the case in deciding whether [to] believe the testimony of [RW] and in deciding how much weight to give that testimony."

Defendant was convicted as described above. This appeal followed.

## II. OTHER-ACTS EVIDENCE

The Court reviews a preserved evidentiary challenge for an abuse of discretion. *People v Roscoe*, 303 Mich App 633, 645; 846 NW2d 402 (2014). Defendant argues that the trial court erred by permitting RW to testify about an uncharged act under MRE 404(b). We disagree.

MRE 404(b)(1) generally prohibits the admission of evidence "of other crimes, wrongs, or acts . . . to prove the character of a person in order to show action in conformity therewith." The rule further provides as follows:

> It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, scheme, plan, or system in doing an act, knowledge, identity, or absence of mistake or accident when the same is material, whether such other crimes, wrongs, or acts are contemporaneous with, or prior or subsequent to the conduct at issue in the case.

Our Supreme Court has instructed trial courts to use "the evidentiary safeguards already present in the Rules of Evidence" to determine whether to admit other-acts evidence under MRE 404(b). *People v VanderVliet*, 444 Mich 52, 74; 508 NW2d 114 (1993), amended on other grounds 445 Mich 1205 (1994). First, the evidence must "be offered for a proper purpose," meaning that it is "relevant to an issue other than propensity." *Id*. (quotation marks and citation omitted). Second, "the evidence must be relevant under Rule 402, as enforced through Rule 104(b), to an issue or fact of consequence at trial." *VanderVliet*, 444 Mich at 74. Third, the trial court should "determine whether the probative value of the similar acts evidence is substantially outweighed by its potential for unfair prejudice." *Id*. (quotation marks and citation omitted). Fourth, "the trial court shall, upon request, instruct the jury that the similar acts evidence is to be considered only for the proper purpose for which it was admitted." *Id*. (quotation marks and citation omitted).

### A. COMMON SCHEME OR PLAN

Our Supreme Court has held that "evidence of similar misconduct is logically relevant to show that the charged act occurred where the uncharged misconduct and the charged offense are sufficiently similar to support an inference that they are manifestations of a common plan, scheme, or system." *People v Sabin (After Remand)*, 463 Mich 43, 63; 614 NW2d 888 (2000). Although general similarities will not suffice, "the plan need not be unusual or distinctive; it need only exist to support the inference that the defendant employed that plan in committing the charged offense." *Id*. at 65-66 (quotation marks and citation omitted).

In this case, the trial court found enough similarities in the evidence of the assaults on KS and RW to admit the latter's testimony. We agree. KS and RW both testified that they were acquainted with defendant, and defendant expressed his belief that both women had indicated romantic interest in him in the past. Defendant also had contact with both women shortly before the afternoon in question and had been flirtatious with them. Defendant messaged both women asking for a ride on the day of the offense. Moreover, both incidents took place at the closed bar where defendant worked, which allowed defendant an opportunity to be alone with each woman.

-4-

Once inside, defendant locked the door behind each of them, and each stated that defendant assaulted them on the pool table. And, of course, the two alleged assaults occurred on the same day. Taken together, these similarities showed that defendant acted in accordance with a common plan or scheme. See *People v Knapp*, 244 Mich App 361, 378-380; 624 NW2d 227 (2001) (affirming the trial court's admission of other-acts evidence because "each step of defendant's prior conduct in approaching and isolating his victim mirrored his conduct in this case").

We also agree with the trial court that the challenged evidence was relevant to show whether a forcible assault on KS had occurred. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 401. The elements of third-degree criminal sexual conduct include "sexual penetration with another person" along with circumstances including the use of "[f]orce or coercion . . . to accomplish the sexual penetration." MCL 750.520d(1)(b). RW's testimony described conduct meeting the elements of the charged conduct, where she testified to penile-vaginal penetration and defendant's use of force in accomplishing it. As stated, the testimony reflected numerous notable similarities between the two assaults, rendering RW's testimony relevant to facts of consequence in this case. See, *People v Bass*, 317 Mich App 241, 261-262; 893 NW2d 149 (2016).

Defendant argues that because the alleged assault on RW occurred after the assault on KS, RW's testimony cannot show a preexisting scheme or plan. But MRE Rule 404(b) does not require that the charged act have occurred first; rather, it covers acts "contemporaneous with, or prior or subsequent to the conduct at issue in the case," and the trial court properly so instructed the jury. Defendant relies on language in *Sabin* to the effect that the purpose of other-acts evidence is " 'to prove a preexisting design, system plan, or scheme, directed forwards to the doing of that act.' " *Sabin*, 463 Mich at 64, quoting 2 Wigmore Evidence (Chadbourn rev), § 304, p 249. However, defendant erroneously equates the *plan* with its *execution*. Defendant messaged KS and RW at the same time asking for a ride, and those messages ultimately brought both women to the bar. The relative timing of the charged and uncharged acts is immaterial; RW's testimony is indicative of a preexisting common scheme or plan by defendant to lure women to his place of employment that Sunday to sexually assault them.

Defendant argues that KS's and RW's descriptions of defendant's use of the pool table in the assaults was not indicative of a common scheme or plan to assault the women, but merely indicates that the pool table was near the entrance to the bar. However, the positioning of the pool table, and each woman's testimony that she was assaulted on that pool table, when considered in context with the other similarities identified, support the trial court's finding that the other act and the charged act were sufficiently similar to show a common scheme or plan and to justify the admission of RW's testimony. Even if the use of the pool table in the two assaults was by chance, sufficient similarities between the charged and uncharged acts would remain to support the trial court's admission of RW's testimony.

Defendant also presents his own version of what happened on the day in question and argues that his portrayal of the two incidents indicates that they are too different to support the admission of RW's testimony. Defendant's argument goes not to the admissibility of RW's testimony, however, but rather to its credibility, which is a matter for the jury to resolve. See

*People v Kelly*, 317 Mich App 637, 645-646; ___ NW2d ___ (2016) (explaining that the defendant's asserted innocence presented a question of credibility for the jury to decide, but was not a proper factor to consider in determining the relevance of proposed other acts evidence).

The trial court also found the probative value of the evidence not to be substantially outweighed by their prejudicial effect. We agree. Not all prejudice is unfair prejudice, and in this case, where KS's testimony and defendant's own admissions confirmed many of the statements made by RW, there was little danger that marginally probative evidence would be given undue or preemptive weight by the jury. *People v Ortiz*, 249 Mich App 297, 306; 642 NW2d 417 (2001). Further, the trial court twice gave the jury a limiting instruction regarding RW's testimony and the purposes for which it could be considered. Limiting instructions "can help to alleviate the danger of unfair prejudice, given that jurors are presumed to follow their instructions." *Roscoe*, 303 Mich App at 646.

In sum, the trial court did not abuse its discretion by admitting the challenged other-acts evidence.

## B. CONSENT

We also agree with the trial court that RW's testimony was relevant to the issue of consent. Defendant characterizes KS's and RW's conduct, in going to the bar to meet defendant, as that of two people meeting in a private place, reflective of consensual sex. However, defendant's assertion of consent in both cases "underscores, rather than obviates, the relevancy of the other acts evidence." *Kelly*, 317 Mich App at 646. Again, "defendant's differing version of events" raised an issue of credibility for the jury to decide, but did not mandate the exclusion of the challenged evidence. See *id*. Because RW testified to an uncharged assault, KS testified about the assault at issue, and defendant testified that both encounters were consensual, the trial court properly found RW's testimony relevant to the issue of consent.

Moreover, "evidence that is admissible for one purpose does not become inadmissible because its use for a different purpose would be precluded." *VanderVliet*, 444 Mich at 73. Accordingly, the admission of RW testimony to show defendant's common scheme or plan, as relevant to how defendant committed the offense, does not become inadmissible even if it bears no relevance to the issue of consent (and vice versa). The trial court did not abuse its discretion by admitting the challenged testimony.

## C. DUE PROCESS

Defendant argues that his right to due process was violated because he was convicted for an uncharged alleged wrong. However, defendant failed to preserve this argument with an objection below, and likewise fails on appeal to offer substantial argument in support of it. In light of these failures of preservation and presentation, we decline to consider the argument. See *People v Matuszak*, 263 Mich App 42, 59; 687 NW2d 342 (2004) (deeming the appellant's ineffective assistance of counsel arguments abandoned where he gave them "only cursory treatment").

In any event, defendant fails to show plain error. Defendant merely restates the rationale for the 404(b) balancing test, which is to alleviate the danger of convicting a defendant of bad character rather without regard for his or her guilt in connection with the charged offense. See *People v Crawford*, 458 Mich 376, 383-384; 582 NW2d 785 (1998) (recognizing that the prohibition of propensity evidence follows from the presumption of innocence, and the risk that a jury will infer guilt "on the basis of . . . bad character"). Accordingly, our resolution of the 404(b) issues answers defendant's due process argument. See *People v Gaines*, 306 Mich App 289, 303 n 9; 856 NW2d 222 (2014) ("Defendant's claim that the admission of other-acts evidence violates due process is moot because the admission of the evidence was subject to the MRE 403 balancing test.").

## III. CONFRONTATION CLAUSE

Defendant also argues that his constitutional right of confrontation was violated when the trial court prohibited him from cross-examining RW about her bipolar disorder and history of fabricating stories. We disagree. Defendant did not object to the trial court's evidentiary ruling on constitutional grounds. See *People v Coy*, 258 Mich App 1, 12; 669 NW2d 831 (2003). We thus review it "for plain error affecting defendant's substantial rights." *Roscoe*, 303 Mich App at 639.

The Sixth Amendment to the United States Constitution[1] recognizes a defendant's right "to be confronted with the witnesses against him." The Confrontation Clause secures "the right of cross-examination," but "not without limit." *People v Adamski*, 198 Mich App 133, 138; 497 NW2d 546, app dis 508 NW2d 493 (1993). "The scope of cross-examination is within the discretion of the trial court." *People v Canter*, 197 Mich App 550, 564; 496 NW2d 336, 343 (1992). The trial court may curtail cross-examination "with respect to collateral matters bearing only on general credibility . . . as well as on irrelevant issues." *Id*.

In this case, the trial court did not plainly err by not permitting defense counsel to cross-examine RW regarding her mental health. The trial court deemed evidence of RW's mental health not relevant to the assault in question, particularly where defendant did not connect RW's bipolar disorder and consequent use of medication with his representation that RW had a history of fabricating stories. The trial court noted that mental illness, or the use of attendant medication, do not necessarily imbue a person with a propensity to lie. Defense counsel failed to draw a logical connection between RW's mental health and a propensity to lie, but instead merely asserted counsel's own opinions on the matter, as demonstrated by his reference to RW as a "crazy person." Further, even after a recess, defendant could identify no authority permitting that line of questioning. In the absence of a link between RW's mental health and credibility, the trial court did not plainly err by deeming RW's mental health history "completely unrelated to this event."

---

[1] See also Const 1963, art 1, § 20.

Additionally, defendant did cross-examine RW about her encounter with defendant, and called witnesses to testify both regarding RW's reputation for untruthfulness and defendant's reputation for truthfulness.  Further, the trial court instructed the jury regarding the assessment of witness credibility.

Defendant also attempted to introduce specific evidence that RW had fabricated stories in the past.  MRE 608(b) places "in the discretion of the court" the decision whether to permit cross-examination regarding specific instances of conduct.  The trial court permitted defense counsel to ask RW about specific instances of conduct when he asked her if she "ever made up stories about other people concerning sexual matters in the past."  RW's denial properly put an end to the matter.  See *People v LeBlanc*, 465 Mich 575, 590; 640 NW2d 246 (2002) (acknowledging the long-standing rule "that a cross-examining attorney must accept the answer given by a witness regarding a collateral matter").  The trial court acted properly within its discretion in ruling that MRE 608(b) did not permit defendant to offer extrinsic evidence to prove otherwise, particularly considering that RW was not the victim of the charged offense.  See *People v Brownridge*, 459 Mich 456, 463-465; 591 NW2d 26, amended on other grounds 459 Mich 1276 (1999).

Affirmed.


/s/ Colleen A. O'Brien
/s/ Joel P. Hoekstra
/s/ Mark T. Boonstra

-8-