*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

       Plaintiff-Appellee,

v

DION DAMAR HARDY,

       Defendant-Appellant.

UNPUBLISHED
May 27, 2021

No. 351121
Saginaw Circuit Court
LC No. 18-045527-FC

Before: CAMERON, P.J., and BORRELLO and REDFORD, JJ.

PER CURIAM.

Defendant appeals as of right his jury-trial convictions of assault with intent to commit murder (AWIM), MCL 750.83, and possession of a firearm during commission of a felony (felony-firearm), MCL 750.227b(1). Defendant was sentenced to serve 7 to 20 years' imprisonment for AWIM and two consecutive years' imprisonment for felony-firearm. For the reasons set forth in this opinion, we affirm.

## I. BACKGROUND

This case arises out of a shooting that occurred on August 10, 2019 in Saginaw, Michigan. Defendant and his codefendant, Ricky Howard Morgan were tried jointly before the same jury in Saginaw County. The basic facts are that the complainant and defendant got into an altercation outside of the complainant's mother's home. After others had joined the fight, the complainant pulled a knife and retreated to his vehicle. The prosecution argued that as the complainant was driving away, Morgan handed a gun to defendant, who then shot at the complainant's car attempting to kill the complainant.

However, this appeal primarily centers around the testimony of the complainant and his mother. Initially, both the complainant and his mother told police that defendant shot at the complainant as the complainant was leaving the scene of a physical altercation he had with defendant. However, by the time of trial, both the complainant and his mother recanted their prior statements to the police by testifying that they did not know who fired the shots at the complainant.

-1-

According to testimony introduced at trial, the complainant was visiting his mother when he and defendant got into a physical altercation. According to the complainant's mother, she went outside to see who was fighting. At trial she testified that she did not see who her son was fighting, and did not see who, if anyone, shot at her son. This testimony was contradicted by Detective Peter Oskvarek of the Michigan State Police who testified he became involved with the case when he received a letter, written on the day of the shooting, from the complainant's mother. In an excerpt of that letter read to the jury the complainant's mother wrote:

> I came outside and told Dion you not going to fight my son. He told me to move out of his face . . . . [A]fter they got done fighting, my son was leaving. That's when Dion started shooting at my son. When he start (sic) shooting, I fell and went to the hospital.

After reviewing this statement, the detective administered photo lineups to both the complainant and his mother. According to the detective, both the complainant and his mother selected defendant's photograph. A tape of the conversation between the detective and complainant was played at trial:

> *Q.* Okay. You told that officer on August 15th in that interview that Ricky gave Dion a gun and they both started firing at you, correct? Do you recall hearing that?
>
> *A.* Yeah. I don't remember that though.

At trial, the complainant testified that he circled the picture of defendant and named him as the shooter because "that was the only person [he] thought could have did (sic) it at the time." The complainant also testified at the preliminary examination that he did not want to testify because his "life was being threatened." Similarly, at trial, the complainant's mother testified that she identified defendant in the photo array because she felt pressured to circle someone, but she did not know why she felt pressured.

At the close of the prosecutor's proofs, defendant moved for a directed verdict of acquittal, which was denied. Defendant then brought forth witnesses who identified another person as the shooter. The jury convicted defendant as stated above. Following trial, the complainant wrote a letter to the trial court stating that defendant did not shoot at him. Based on this evidence, defendant brought a motion in the trial court for a new trial based on what defendant labeled "newly discovered evidence." Defendant also requested a new trial on the basis that such relief would be in the "interest of justice." The trial court denied the motion and this appeal ensued.

## II. ANALYSIS

In his appeal, defendant's first issue is actually two distinct issues, bound together by defendant's assertion that the trial court erred by denying him a new trial. First, defendant argues that the verdict was against the great weight of the evidence, and as such, allowing the conviction to stand would constitute a miscarriage of justice. Second, defendant argues, that the trial court abused its discretion by not granting defendant a new trial based on the "newly discovered evidence" of the letter penned by the complainant.

"This Court reviews for an abuse of discretion a trial court's decision to grant or deny a motion for a new trial. An abuse of discretion occurs when the trial court renders a decision falling outside the range of principled decisions." *People v Powell*, 303 Mich App 271, 276-277; 842 NW2d 538 (2013) (quotation marks and citation omitted). "This Court reviews for clear error the factual findings underlying the trial court's application of the law. A finding is clearly erroneous when this Court is left with the definite and firm conviction that the trial court erred." *People v Rogers*, ___ Mich App ___, ___; ___ NW2d ___ (2020) (Docket No. 336000); slip op at 8-9.

Defendant first argues that the jury's verdict was against the great weight of the evidence. "A trial court may grant a motion for a new trial based on the great weight of the evidence only if the evidence preponderates so heavily against the verdict that it would be a miscarriage of justice to allow the verdict to stand." *People v Unger*, 278 Mich App 210, 232; 749 NW2d 272 (2008). "Generally, a verdict may be vacated only when the evidence does not reasonably support it and it was more likely the result of causes outside the record, such as passion, prejudice, sympathy, or some other extraneous influence." *People v Lacalamita*, 286 Mich App 467, 469; 780 NW2d 311 (2009). A determination of whether a verdict is against the great weight of the evidence requires a review of the whole body of proofs. *People v Herbert*, 444 Mich 466, 475; 511 NW2d 654 (1993), overruled in part on other grounds *People v Lemmon*, 456 Mich 625, 647; 576 NW2d 129 (1998).

"[A]bsent exceptional circumstances, issues of witness credibility are for the jury, and the trial court may not substitute its view of the credibility for the constitutionally guaranteed jury determination thereof." *Lemmon*, 456 Mich at 642 (quotation marks and citation omitted). "Conflicting testimony, even when impeached to some extent, is an insufficient ground for granting a new trial." *Id.* at 647. A narrow exception exists when "directly contradictory testimony was so far impeached that it was deprived of all probative value or that the jury could not believe it, or contradicted indisputable physical facts or defied physical realities . . . ." *Id.* at 645-646.

"The elements of assault with intent to commit murder are (1) an assault, (2) with an actual intent to kill, (3) which, if successful, would make the killing murder. The intent to kill may be proved by inference from any facts in evidence." *People v Jackson*, 292 Mich App 583, 588; 808 NW2d 541 (2011) (quotation marks and citation omitted). "A person is guilty of felony-firearm if the person possesses a firearm during the commission of a felony." *Id.* (quotation marks and citation omitted).

Here, defendant's arguments rest on what he labels "a complete lack of evidence" that he was the shooter. "[I]t is well settled that identity is an element of every offense." *People v Yost*, 278 Mich App 341, 356; 749 NW2d 753 (2008). However, defendant's recitation of the trial evidence is not entirely accurate.

During trial, the jury was presented with testimony that the complainant told police defendant was the shooter, and the complainant identified defendant as the shooter during a photo lineup. The investigation began when complainant's mother sent a letter to the police stating that she saw defendant shoot at the complainant. The complainant's mother also identified defendant as the shooter during a photo lineup. She recanted her preliminary examination testimony by stating she was on morphine that day and had no memory of what she may have stated. However, the complainant's mother did not deny that she had previously testified that defendant was the

shooter. The complainant acknowledged that he had previously testified that he did not want to testify because he had been threatened. Both recanted their testimony during trial, however it was the state's theory that they did so out of intimidation and fear of retribution for testifying against defendant. There was evidence to support this theory in the form of the complainant's testimony at the preliminary examination that he did not want to testify out of fear that his life was being threatened.

Additionally, while both defendant and his codefendant denied any participation in the shooting, both admitted to police that they were present at the scene of the altercation and shooting.

As such, defendant's arguments regarding the great weight of the evidence are in actuality, a request for this Court to weigh the credibility of the evidence. The fact that the complainant and his mother both recanted their testimony was part of the record, as was their testimony naming defendant as the shooter. There was also evidence of another shooter as well as evidence that defendant and his codefendant were present at the scene. The jury also heard additional prior statements made by the complainant and his mother as well as the complainant's preliminary examination testimony indicating that testifying against defendant made the complainant fear for his safety. This conflicting evidence amounts to a question of weight and credibility, and these questions are to be resolved by the jury. *People v Anderson*, 322 Mich App 622, 633; 912 NW2d 607 (2018).

In fact, the prosecution's theory of the case center around complainant and his mother being fearful of testifying against defendant. The prosecution argued that the jury should disregard their trial testimony and focus on their prior statements and testimony. Those statements, if believed, provided a reasonable finder of fact with sufficient evidence to find beyond a reasonable doubt that defendant committed the offenses for which he was convicted. While there was conflicting testimony, it cannot be said that the evidence of defendant's guilt was "so far impeached that it was deprived of all probative value or that the jury could not believe it, or [that it] contradicted indisputable physical facts or defied physical realities . . . ." *Lemmon*, 456 Mich at 645-646. Moreover, defendant has presented no basis upon which to conclude that the verdict was "the result of causes outside the record, such as passion, prejudice, sympathy, or some other extraneous influence." *Lacalamita*, 286 Mich App at 469.

Defendant next argues he is entitled to a new trial because of newly discovered evidence in the form of two letters written by the complainant in which he states that defendant was not the shooter. "[M]otions for a new trial on the ground of newly-discovered evidence are looked upon with disfavor, and the cases where this court has held that there was an abuse of discretion in denying a motion based on such grounds are few and far between." *People v Rao*, 491 Mich 271, 279-280; 815 NW2d 105 (2012). Our Supreme Court has provided a four-part test to determine whether newly discovered evidence entitles a defendant to a new trial, and the defendant bears the burden to establish each part of this test. *Id.* at 279. To receive a new trial, defendant must demonstrate that: "(1) the evidence itself, not merely its materiality, was newly discovered; (2) the newly discovered evidence was not cumulative; (3) the party could not, using reasonable diligence, have discovered and produced the evidence at trial; and (4) the new evidence makes a different result probable on retrial." *People v Cress*, 468 Mich 678, 692; 664 NW2d 174 (2003).

"In order to determine whether newly discovered evidence makes a different result probable on retrial, a trial court must first determine whether the evidence is credible." *People v Johnson*, 502 Mich 541, 566-567; 918 NW2d 676 (2018). "[W]here newly discovered evidence takes the form of recantation testimony, it is traditionally regarded as suspect and untrustworthy." *People v Canter*, 197 Mich App 550, 559; 496 NW2d 336 (1992). "While it remains within the trial court's discretion to evaluate a witness's credibility on a motion for new trial the trial court must do so while contemplating a future trial and the role of a future fact-finder." *Rogers*, ___ Mich App at ___; slip op at 13 (quotation marks and citations omitted). Recanted testimony will not warrant a new trial unless a reasonable juror could find the testimony credible on retrial. *Johnson*, 502 Mich at 567. If we determine that a reasonable juror could find the recantation testimony credible, we then must "consider the impact of that testimony in conjunction with the evidence that would be presented on retrial." *Id.* at 571.

We need not reach the issue of whether the trial court erred in finding that the proffered evidence was "highly suspect" as defined in *Canter*, 197 Mich App at 560, as we conclude that the proffered evidence did not constitute newly discovered evidence. Here, the proffered evidence of the complainant recanting his statements that defendant was not the shooter had already been presented to the jury. During trial, both the complainant and his mother recanted their prior statements that defendant was the shooter. Additionally, other witnesses testified that another person was the shooter. As a consequence, the proffered evidence would merely be cumulative of the complainant's trial testimony. As such, the proffered evidence did not constitute newly available evidence, *Cress*, 468 Mich at 692, and the trial court did not err in denying defendant's motion for a new trial.

Defendant next argues that prosecutorial misconduct deprived him of his right to a fair trial by continuously arguing to the jury that this case was an example of the vernacular, "snitches get stiches." Defendant argues that such a statement constituted an improper elicitation of sympathy, and there was no evidence that defendant ever threatened the complainant to prevent him from testifying. In addition, defendant argues, the prosecutor then used an improper appeal to the jury's civic duty to do justice.

Claims of prosecutorial misconduct are reviewed de novo. *People v Dunigan*, 299 Mich App 579, 588; 831 NW2d 243 (2013), lv den 494 Mich 870 (2013). However, defendant did not object to any of the prosecutor's statements, and this issue therefore is unpreserved. Unpreserved claims of prosecutorial misconduct are reviewed for plain error. *People v Evans*, ___ Mich App ___, ___; ___ NW2d ___ (2020) (Docket No. 343544); slip op at 6. A plain error occurs if three requirements are "met: 1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights. The third requirement generally requires a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings." *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999), reh den 461 Mich 1205 (1999) (citation omitted).

"Curative instructions are sufficient to cure the prejudicial effect of most inappropriate prosecutorial statements and jurors are presumed to follow their instructions." *Unger*, 278 Mich App at 235 (citations omitted). Therefore, unpreserved claims of prosecutorial misconduct will not warrant reversal unless a curative instruction would have been insufficient to alleviate the harm caused by the misconduct. *Id.*

"The test for prosecutorial misconduct is whether the defendant was deprived of a fair trial." *People v Orlewicz*, 293 Mich App 96, 106; 809 NW2d 194 (2011). Prosecutorial misconduct claims are reviewed on a case-by-case basis. *Mullins*, 322 Mich App at 151. "Prosecutors are typically afforded great latitude regarding their arguments and conduct at trial. They are generally free to argue the evidence and all reasonable inferences from the evidence as it relates to their theory of the case." *Unger*, 278 Mich App at 236 (citation omitted). "A prosecutor may not make a factual statement to the jury that is not supported by the evidence, but he or she is free to argue the evidence and all reasonable inferences arising from it as they relate to his or her theory of the case." *People v Dobek*, 274 Mich App 58, 66; 732 NW2d 546 (2007) (citations omitted). Moreover, "[t]he prosecution has wide latitude in arguing the facts and reasonable inferences, and need not confine argument to the blandest possible terms." *Id.* A prosecutor may not vouch for the credibility of a witness by implying that he or she has some special knowledge that the witness is testifying truthfully or untruthfully. *Id.* A prosecutor is, however, permitted to argue from the facts and testimony that a witness is or is not credible. *Id.* "The prosecutor may not inject issues into a trial that are broader than the defendant's guilt or innocence. The prosecutor commits misconduct when he or she invites jurors to suspend their powers of judgment and decide the case on the basis of sympathy or civic duty." *People v Lane*, 308 Mich App 38, 66; 862 NW2d 446 (2014).

The prosecutor made several references to the expression "snitches get stitches." During the jury selection process, the prosecutor said to the venire:

> Okay. Let me ask all of you this, and I don't mean to trivialize it, but it's an expression out there, both in the arts and in the courtroom. Any of you familiar with the phrase snitches get stitches? And I'm seeing lots of heads, okay. If somebody is afraid of being perceived as a snitch and the consequences that fall from that, is that something if you determine that's in play here, is that something you would consider in evaluating their testimony? . . . So if somebody is afraid of being perceived as a snitch, and just I think we're all adults, but the record may need to know that a snitch is somebody that tells on somebody else if you will of testifies against somebody else. If somebody is afraid of that perception and afraid of the potential consequences and somehow visibly or audibly demonstrates that in the courtroom, is that something you wouldn't take into account?

During opening statements, the prosecutor said:

> When the police respond, it's later found out that [the complainant] is in the residence but will not come to the door. After all, as we talked about in voir dire, snitches get stitches.

> * * *

> The People have subpoenaed or attempted to subpoena [the complainant]. I will tell you that it is not clear as to whether he will appear or not. And whatever steps are taken to deal with that will be determined as this trial unfolds. But again, remember what we talked about or what I talked about with you in voir dire. Snitches get stitches. And sometimes there are reasons, reasons apparently more

important to the individual than the outcome of a jury trial in Saginaw County, as to why they might not want to tell that story, no matter how important it is to us.

Finally, during closing arguments, the prosecutor said:

> Who, ladies and gentlemen, does that leave? Well, that, my friends, is for you to decide. I submit that the answer is crystal clear and I don't have to speculate. I don't have to voice any speculation. The answer to that question is crystal clear. Who's going to give the snitches stitches? Who are the peers putting pressure on [the complainant's mother]? Well, it's none of us. And I'll go a step further. I'll say that it wasn't the defense attorneys. Nobody. When you eliminate the possibilities, you know what remains.

As previously stated, here, the prosecutor's theory of the case was the complainant and his mother were truthful about defendant shooting at him when they gave their initial statements to the police. However, as the matter came closer to trial, the complainant indicated that he was worried about his personal safety because of his testimony against defendant, and, according to the prosecutor, changed his testimony so as to not incur the wrath of whomever he feared. It was therefore a reasonable inference from this evidence to argue that because the complainant had previously testified he felt threatened, he was no longer willing to testify against defendant. It is permissible for the prosecution to make arguments relating to the inferences that the jury should draw from the evidence. *Unger*, 278 Mich app at 236. The prosecution used the expression "snitches get stitches" as a rhetorical tool to illustrate its theory of why the complainant recanted and to persuade the jury that his initial statement was truthful. We note that prosecutors are not required to "confine argument to the blandest possible terms." *Dobek*, 274 Mich App at 66. Moreover, defendant has presented us with no basis upon which to conclude that a curative instruction would have been insufficient to alleviate any harm as is required for plain error review of prosecutorial misconduct. *Unger*, 278 Mich App at 235. Additionally, the jury was instructed by the trial court that the statements of the attorneys are not evidence and jurors are presumed to follow their instructions. *People v Graves*, 458 Mich 476, 486; 581 NW2d 229 (1998).

Defendant argues that the prosecution also made an improper appeal to the jury's sense of civic duty. The prosecution concluded its rebuttal by saying, "We submit that justice happens here, as a result of jury verdicts. Not as a function of peer pressure. And not as a function of threats. Which is why we're asking you for verdicts of guilty as to all four counts. Thank you." When viewed in context, the prosecutor was arguing that a guilty verdict would result in justice because the evidence proved that defendant was guilty. We cannot find from this single sentence that the prosecutor injected "issues broader than [defendant's] guilt into the trial" and he also "did not urge the jury to suspend its powers of judgment and find [defendant] guilty on the basis of civic duty or sympathy." *Lane*, 308 Mich App at 66. Accordingly, defendant is not entitled to relief on this issue.

Affirmed.

/s/ Thomas C. Cameron
/s/ Stephen L. Borrello
/s/ James Robert Redford